IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KENNETH K. SWEARNIGEN-EL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| COOK COUNTY SHERIFF'S DEPARTMENT, | ) |
| MICHAEL F. SHEAHAN, in his | ) |
| individual and official capacity as | )   No. 05-C-1493 |
| Sheriff of Cook County, Illinois, | ) |
| CALLIE BAIRD, in her individual | ) |
| capacity, KATIE HARRISON, in her | ) |
| individual capacity, SCOTT | ) |
| KURTOVICH, in his individual | ) |
| capacity, the COUNTY OF COOK, a unit | ) |
| of local government, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kenneth Swearnigen-El ("plaintiff"), an
African-American male and former correctional officer, filed a six-
count complaint against the defendants that alleges race and gender
discrimination in violation of Title VII of the Civil Rights Act of
1964 ("Title VII"), 42 U.S.C. § 1983, and 42 U.S.C. § 1981,
retaliation under 42 U.S.C. § 1983, and two Illinois state law
claims.  The Cook County Sheriff's Department operates the Cook
County Department of Corrections ("CCDOC") and the Cook County
Sheriff's Police ("CCSP").  During the relevant time period,
Sheahan was the Sheriff of Cook County, Baird was the Executive
Director of the CCDOC, Kurtovich was the CCDOC's Assistance
Executive Director, and Harrison was the Superintendent of the

CCDOC division that houses only female detainees.

Defendants move for summary judgment on all counts.  For the following reasons, defendants' motion is granted.[1]

I.

In March 2003, a female detainee gave Harrison a letter containing allegations that correctional officers were engaging in sexual intercourse with female detainees.  The letter complaint did not include specific allegations against plaintiff.  Harrison forwarded the complaint to the Internal Affairs Division ("IAD") of the CCDOC, who then forwarded the complaint to the CCSP for a criminal investigation.  Detectives from the CCSP conducted interviews of numerous female detainees and submitted information gathered from their investigation to the Felony Review Unit of the Cook County State's Attorney's Office.  Assistant State's Attorneys ("ASA") Freeman and Lechrone were assigned to the case.  They conducted their own interviews with detainees and eventually

---

[1]  Defendants also move to strike plaintiff's Local Rule ("LR") 56.1 Statement of Additional Facts ("SOAF"), his supplemental 56.1 SOAF, and his response to defendants' LR 56.1 Statement of Facts ("SOF").  I do not consider additional facts proposed in the nonmoving party's LR 56.1 response, but instead rely on the nonmoving party's LR 56.1 SOAF and supplemental LR 56.1 SOAF.  I also disregard the numerous statements and responses that consist of hearsay, improper argument, and evasive denials, in addition to those that do not properly cite to the record or are otherwise improper.  *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006) ("district courts are entitled to expect strict compliance with Local Rule 56.1"); *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)(no abuse of discretion in striking responses consisting of evasive denials and improper argument).

2

criminally charged three of the twenty or so correctional officers investigated, one of whom was plaintiff. An administrative complaint seeking plaintiff's termination was also filed.  He was subsequently placed on paid leave from work, pending a *Loudermill*[2] hearing.

Detainees told CCSP investigators and the ASAs that plaintiff had inappropriate sexual contact and relations with detainee Portia Warrington ("Warrington").  Warrington was interviewed and told CCSP investigators and ASAs that she had sex with plaintiff. Plaintiff's telephone records showed that between March 1, 2003, and May 31, 2003, Warrington made approximately 100 collect telephone calls from jail to his personal phone number and that he accepted about 25 of those calls.

When the criminal charges were made public, plaintiff was out of the country on a scheduled vacation.  Having learned of the charges, plaintiff arranged with the department to turn himself on August 27, 2003 - the day after he returned from vacation.  He was processed into and bonded out of jail that same day.  On August 28, 2003, while on leave, plaintiff resigned, noting in his paperwork that he was leaving the CCDOC to go back to school.  Plaintiff was

---

[2] *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)(due process requires pre-termination hearing for employees with  constitutionally protected interest in their employment); *Wainscott v. Henry*, 315 F.3d 844, 853 (7th Cir. 2003)(explaining *Loudermill* requirements).

indicted by a grand jury, prosecuted, and after a bench trial, was acquitted.

II.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant initially bears the burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)(2).

In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). At summary judgment, the "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *National Athletic Sportswear,*

4

*Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

III.

Counts I-III of the complaint allege race and gender discrimination in violation of Title VII and § 1983, and race discrimination in violation of § 1981. I address these claims together because the *prima facie* case for each of them requires proof of an adverse employment action. *See Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 730 (7th Cir. 2009); *Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006); *O'Neal v. City of Chicago*, 392 F.3d 909, 910-11 (7th Cir. 2004). Among other arguments, defendants contend that plaintiff's discrimination claims fail because he did not suffer an adverse employment action - he resigned. In response, plaintiff argues only that his resignation amounts to an adverse employment action because it was effectively a constructive discharge.

As support for his argument, plaintiff explains that an administrative complaint seeking his termination had been filed and he was placed on paid leave pending a *Loudermill* hearing scheduled for the next week. However, initiation of administrative proceedings alone does not equate to threatened termination or coercion. *See Cigan v. Chippawa Falls Sch. Dist.*, 388 F.3d 331, 333-334 (7th Cir. 2004)(initiation of discharge proceedings is not the same as an actual discharge; "the prospect of being fired at the conclusion of an extended process is not itself a constructive

discharge"). Plaintiff was entitled to fight disciplinary action and present his side of the story at his *Loudermill* hearing. He chose to resign instead because he was worried the administrative proceedings would not go his way and he thought it would be easier to explain to potential future employers that he left the CCDOC to attend school. This reasoning does not support a finding of constructive discharge.

Although plaintiff argues that he was given the choice to resign or be fired, none of the defendants are alleged to have communicated with plaintiff prior to his resignation and none had the authority to terminate him. *See* 55 ILCS 5/3-7012 ("no employee in the County Department of Corrections shall be removed, demoted, or suspended except for cause, upon written charges filed with the [Merit] Board by the Sheriff and a hearing before the [Merit] Board"). That plaintiff believed *Loudermill* was a "rubber stamp" and Merit Board proceedings never favor employees does not amount to threatened termination and does not mean his decision to resign was equivalent to a discharge.

In fact, the Seventh Circuit has clearly stated that it is not constructive discharge when an employee, suspended with pay pending an administrative hearing, resigns prior to the resolution of those proceedings:

> a person who is on leave with pay...pending an
> investigation of serious job misconduct, who resigns
> rather than waits for the conclusion of reasonable
> prescribed due process procedures of the institution, has

>    not from an objective standpoint been constructively
>    discharged.

*Levenstein v. Salafsky*, 414 F.3d 767, 774 (7th Cir. 2005). Rather, constructive discharge is found where a plaintiff proves harassing behavior sufficiently severe or pervasive to alter the conditions of employment and an abusive working environment so intolerable that resignation is a fitting response. *Id.* The question is whether a reasonable person in the employee's position would feel compelled to resign. *Id*.

Plaintiff argues that *Levenstein* is distinguishable because the plaintiff in that case, a teacher accused of sexually harassing students, "was only temporarily reassigned and the employer was still attempting to remedy the situation," while his situation was "more permanent." (Pl.'s Resp. at p. 13.) Yet the *Levenstein* plaintiff participated in administrative proceedings, enduring a temporary assignment for almost a year before resigning, and still constructive discharge was not found. Here, plaintiff resigned before his *Loudermill* hearing even started, two days after he returned from vacation and was put on paid leave. He never gave the administrative proceedings a chance and only made his situation "permanent" by resigning.

Plaintiff also cites to *Parrett v. City of Connersville*, 737 F.2d 690 (7th Cir. 1984) arguing that his "working conditions" were worse than those described by the constructively discharged plaintiff in that case. The *Parrett* plaintiff was removed from his

position of authority as the chief of detectives because the city attorney had a personal grudge against him - not for any alleged misconduct or cause.  He was then forced to sit in a broom closet with nothing to do for three months, which caused him to suffer a breakdown due to stress.  He only retired once it was clear those working conditions would not change.

Here plaintiff lasted two days on paid leave before resigning. He never actually went back to work.  Regardless, plaintiff contends the conditions at "work" were unbearable because 1) while on vacation, he heard from other people that Sheahan issued statements to the press that plaintiff was a fugitive while he was known to be out of the country on vacation, and 2) on his first day of paid leave, during processing at the jail on criminal charges, other people told him Kurtovich wanted him held in maximum security and threatened disciplinary action against CCDOC employees who tried to visit him or bail him out of jail.  The intolerable "working conditions" plaintiff describes are supported only by hearsay and relate wholly to matters involving his criminal proceedings - not his job.  Moreover, the evidence shows plaintiff was never held in maximum security, but rather bonded out of jail in a matter of hours after being held in the medical unit.

Neither plaintiff's hearsay testimony about non-work related matters nor speculation as to whether plaintiff would have been terminated as a result of administrative proceedings provide a

genuine issue of material fact as to whether plaintiff suffered an adverse employment action.   Accordingly, defendants' motion for summary judgment as to Counts I-III is granted.

IV.

Defendants also move for summary judgment on plaintiff's retaliation claim under § 1983 (Count IV).  To establish a *prima facie* case of First Amendment retaliation, a public employee must show that: (1) his speech was constitutionally protected; (2) he suffered a deprivation that would likely deter protected speech; and (3) the protected speech was at least a motivating factor in his employer's retaliatory action.  *See Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir. 2009).  Plaintiff's speech was protected if (1) he spoke as a citizen on matters of public concern, and (2) his interest as a citizen in commenting upon those matters of public concern "outweighs the interest of the State as an employer in promoting the efficiency of the public services it performs through its employees." *Nagle*, 554 F.3d at 1123 (quoting *Sigsworth v. City of Aurora*, 487 F.3d 506, 509 (7th Cir. 2007)).

Plaintiff bases his retaliation claim on the following speech: (1) a January 2003 statement that he would "fight" Harrison in any attempt to implement a policy change requiring that only female officers guard Division 4; (2) his attempt to bring a new union to the CCDOC; (3) general grievances and complaints about safety issues at the jail, violations of the general orders, and

9

violations of the union contract; (4) his assistance in filing one
grievance and spell-checking a letter for other correctional
officers; and (5) a grievance he allegedly filed against Harrison
concerning her policy of requiring correctional officers to arrive
at work fifteen minutes early.

Plaintiff's retaliation claim fails for a number of reasons.
The January 2003 statement cannot support a retaliation claim
because plaintiff spoke as a public employee and not a citizen when
he told Harrison, while on duty, that he intended to "fight"
implementation of the new policy. *See Mills v. City of Evansville,
Ind.*, 452 F.3d 646, 647-48 (7th Cir. 2006)(finding officer spoke as
public employee when, while on duty and in uniform, she told her
supervisors their new policy would not work, leaving the impression
she would enlist community organizations against it).
Additionally, plaintiff contends he made verbal complaints to two
other superiors, informing them that he felt the new policy was
discriminatory and retaliatory.  Because CCDOC employees have a
duty to report discrimination and retaliation, to the extent these
statements were made, they were made in plaintiff's capacity as a
public employee and do not support a claim for retaliation.  (*See*
Defs.' Ex. 15A, p.4)

Second, plaintiff argues that defendants retaliated against
him because in February 2002 he attempted to bring a new union into
the CCDOC.  However, this activity is too attenuated from the April

2003 criminal investigation to support a retaliation claim and there is no evidence that any of the defendants knew about it. *See Samuelson v. LaPorte Comm. Sch. Corp.*, 526 F.3d 1046, 1053-54 (7th Cir. 2008)(email not motivating factor in decision not to renew contract where there was no evidence decision-maker saw email before decision was made; expressions made more than a year prior to decision were too attenuated to support retaliation claim).

Third, plaintiff's general statements averring that he "spoke out" against harassment, jail safety issues, violations of general orders, unfair labor practices, and other issues are not matters of public concern because they lack precise content, form, and context. *See Nagle,* 554 F.3d at 1123-24.  To the extent his alleged  support for a proposal to make the jail a "closed campus" and his efforts regarding enforcement of a "hat rule," are specific examples, they too fail to support a claim for retaliation as they are matters of personal interest not subject to constitutional protection. *See Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008) (public concern element must relate to community concern and not something of interest only to employee).

Plaintiff also contends defendants retaliated against him because he assisted one correctional officer with preparing a personal grievance against Harrison for alleged sexual harassment and a different correctional officer with spell-checking a letter to Harrison's superiors about an alleged affair.  Aside from the

11

lack of any support for plaintiff's position that spell-checking someone else's letter constitutes protected speech, neither of these matters are of public concern as they relate to private, individual disputes and not issues in which the public at large would have any interest. *See Houskins*, 549 F.3d at 490. Moreover, there is no evidence that the defendants knew about plaintiff's involvement in either matter.

Finally, plaintiff claims that he filed a grievance against Harrison regarding her policy of requiring employees to arrive at work fifteen minutes early. Plaintiff does not point to any evidence that suggests such a grievance was ever filed and fails to explain why it would be a matter of public concern as opposed to an internal office issue not subject to constitutional protection.

For the reasons provided, none of the speech described provides a basis for plaintiff's First Amendment retaliation claim. Accordingly, defendants' motion for summary judgment as to Count IV is granted.[3]

V.

Defendants also move for summary judgment on plaintiff's malicious prosecution claim. Under Illinois law, a plaintiff must

---

[3] Because plaintiff has failed to raise a genuine issue of material fact for trial that defendants violated his constitutional rights, I need not address the defendants' qualified immunity and *Monell* arguments. *See Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007); *Houskins*, 549 F.3d at 493-94(collecting cases).

12

prove:  "(1) the commencement or continuation of an original criminal or civil proceeding by defendants, (2) termination of the proceeding in favor of the plaintiff, (3) the absence of probable cause for the proceeding, (4) the presence of malice on defendants' part, and (5) damages resulting to plaintiff." *Ross v. Mauro Chevrolet*, 369 Ill.App.3d 794, 801, 861 N.E.2d 313, 319 (Ill.App.Ct. 2006); *see also Boyd v. City of Chicago*, 378 Ill.App.3d 57, 71, 880 N.E.2d 1033, 1045 (Ill.App.Ct. 2007)(the absence of any one element bars plaintiff's claim).  Defendants argue that they are entitled to summary judgment on this claim because plaintiff cannot establish either the first or third elements.

With respect to the third element, the absence of probable cause, plaintiff contends that Warrington and other detainees were coerced by defendants into providing false statements against him, and that these false statements alone did not provide probable cause for charging and prosecuting him.  In support of this argument, plaintiff points to the affidavit and deposition testimony of former detainee LaToya Williams ("Williams"). Williams spoke to CCSP investigators in 2003 about correctional officers accused of sexual misconduct, including plaintiff, but never spoke to the ASAs and was not involved in their investigation or their decision to charge and prosecute plaintiff.  She did not testify on behalf of either party at trial.

13

Now, years later, Williams claims the CCSP investigators threatened her and offered her bribes to falsely implicate plaintiff in sexual misconduct with detainees, which Williams contends she refused to do. Williams relayed this information to Harrison, who told her she did not believe Williams had not seen any misconduct. Harrison asked her to wear a wire, which Williams also refused to do. She then told Harrison off and was sent to solitary confinement. Williams also claims that statements attributed to her in CCSP investigation reports (indicating she told investigators plaintiff had sex with detainees) are false, and that other detainees told her they intended to falsely implicate plaintiff because CCSP investigators promised them deals.

Defendants object to Williams' testimony for a variety of reasons. But even if Williams' recent, disputed statements are true, they do not create a genuine issue of material fact for trial. First, the alleged coercion Williams claims CCSP investigators subjected her to is irrelevant because there is no evidence that any of her testimony or statements were used to charge or prosecute plaintiff. Williams was not present for any interviews other than her own and cannot testify as to what happened during interviews with other detainees.

Additionally, the only named defendant to whom Williams attributes improper behavior is Harrison, and her misdeeds are limited to 1) improperly asking Williams about the investigation

several days after her interview with CCSP detectives, 2) not believing Williams' story, and 3) asking Williams to wear a wire, which she refused to do. (*See* Williams Dep. pp. 29-31.) Plaintiff argues that Harrison ordered Williams transferred to solitary confinement because she would not "cooperate" in the investigation, but Williams testified that she was written up and put in solitary confinement for crudely telling Harrison off.[4] (*Id.* pp. 37-38, 98-99.)

While, if true, Williams' testimony suggests Harrison was inappropriately interested in the IAD investigation, it does not support plaintiff's allegations that Harrison (or any of the named defendants) personally 1) threatened, coerced, or bribed Williams, 2) threatened, coerced, or bribed other detainees, or 3) was involved in any way with the ASA investigation, charges, or prosecution. Williams' allegations of coercion are directed solely at non-party CCSP investigators.

Similarly, with regard to detainees Warrington and Aurora Acuna ("Acuna"), Williams' testimony suggests pre-trial misconduct

---

[4] There is also an allegation that Williams was transferred to a division for pregnant detainees and detainees with psychological problems as a result of her lack of cooperation, but that supposedly happened at the same time Williams was sent to solitary confinement in her own division. (*Compare id.* at pp. 31-32 *with* pp. 37-38, 98-99.) It is also unclear as to why this would be considered a punishment since Williams admits that detainees (including herself) were known to fake suicide attempts to get into that division when they wanted out of solitary confinement or out of their regular division. (*See id.* pp. 76-78.)

by the detainees themselves and two CCSP investigators.  According
to Williams, Warrington admitted that she never had sex with
plaintiff and both detainees told her the CCSP detectives promised
them they could "go home" if they agreed to testify falsely against
plaintiff.  Williams' testimony does not suggest that Harrison was
present during their interviews, or that Warrington or Acuna made
similar allegations of misconduct against Harrison, the ASAs who
charged and prosecuted plaintiff, or any of the other named
defendants.  Moreover, Williams testified that she did not report
Warrington's or Acuna's alleged admissions to anyone other than
plaintiff and the other accused correctional officers. (*Id.* pp. 85,
100-101, 114, 136-137.)  Accordingly, even assuming Warrington and
Acuna fabricated their stories (with or without coercion from the
two CCSP investigators), there is no evidence suggesting that the
ASAs, Harrison, or any of the other named defendants were complicit
in that alleged deception.  There is also no evidence that the
named defendants were involved with the ASAs decision to criminally
charge plaintiff, or that they testified in front of the grand jury
or at his trial.

As for plaintiff's suggestion that there was no corroborating
evidence, defendants note that plaintiff's phone records evidence
his acceptance of about 25% of over 100 collect calls made by
Warrington to his personal phone number from jail during the
relevant time period.  Defendants argue that these records provided

16

sufficient corroboration for the detainees' allegations of sexual misconduct by plaintiff and supported probable cause for the charges against him.  Plaintiff does not respond to this argument at all.

Because plaintiff has not pointed to any evidence supporting the absence of probable cause, his malicious prosecution claim necessarily fails.  I need not address defendants' other arguments.  Defendants' motion for summary judgment as to Count V is granted.

VI.

Finally, defendants move for summary judgment on Count VI – plaintiff's claim for intentional infliction of emotional distress.  To prove this cause of action, plaintiff must establish three elements: (1) extreme and outrageous conduct; (2) intent or knowledge by the actor that there is at least a high probability his or her conduct would inflict severe emotional distress; and (3) the conduct does inflict severe and emotional distress.  *See Warfield v. City of Chicago*, 565 F.Supp.2d 948, 965 (N.D.Ill. 2008).

Plaintiff's response to defendants' motion centers on the distress allegedly suffered after his arrest.  The only mention of defendants' "extreme and outrageous" conduct or defendants' intent is the following sentence, which contains the same, unsupported allegations plaintiff contends save all his claims:  "Defendants maliciously alleged acts of sexual misconduct against Plaintiff,

17

they improperly investigated the charges using wire taps and offers of reduced sentences to inmates, chose to arrest Plaintiff based on false and coerced statements, made statements to the press that he was a fugitive while he was out of the country on vacation, arrested him, and attempted to seriously jeopardize his safety by sending him to maximum security."  (Pl.'s Resp. p. 29).

First, there is no evidence that defendants were the ones who made allegations of sexual misconduct against the plaintiff. Harrison received letters from a detainee that alleged sexual misconduct by correctional officers generally – plaintiff was not named in those letters.  She passed them on to IAD who then passed the information on to the CCSP for investigation.  Plaintiff points to no evidence showing any of the named defendants brought his name into the investigation.  Second, as to the "wire tap" statement, the evidence shows one ASA-approved overhear device was used (no wire taps were used) in the investigation, which was worn by Warrington.  Plaintiff does not elaborate on his objection to the use of this device or cite to any record evidence.  It is unclear why this allegation supports plaintiff's claim for intentional infliction of emotional distress.

ASAs Freeman and Lechrone, after conducting their own investigation, decided to approve criminal charges against the plaintiff and prosecute him based on detainee statements that were corroborated in part by plaintiff's own phone records.  Defendants

18

had no authority to bring criminal charges against plaintiff and there is no evidence that they were involved with the ASAs' decision to do so.[5] Finally, plaintiff's contentions that Sheahan called him a fugitive and that Kurtovich tried to hold him in maximum security while he waited to bond out of jail are unsupported by the evidence.

In response to defendants' motion, plaintiff has not pointed to any conduct attributable to the defendants that was "extreme and outrageous" and intentional. Therefore, his claim for intentional infliction of emotional distress cannot withstand summary judgment. Defendants' motion is granted as to Count VI.

VII.

For the foregoing reasons, I grant defendants' motion for summary judgment on all claims. Defendants' motions to strike and quash are denied as moot.

ENTER ORDER:

_____

**Elaine E. Bucklo**
United States District Judge

Date: June 26, 2009

_____

[5] Here again plaintiff suggests that the charges against him were improperly supported by coerced detainee statements, but as discussed earlier, the only evidence of coercion is the testimony of former detainee Williams and she only implicates non-defendant investigators and detainees. There is no evidence that the ASAs, or any of the named defendants, used coercion to obtain detainee testimony supporting the decision to charge and prosecute plaintiff.

19