CERTIFIED COPY

A True Copy
Teste:



Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 09-2709

KENNETH SWEARNIGEN-EL,

*Plaintiff-Appellant,*

*v.*

COOK COUNTY SHERIFF'S DEPARTMENT, et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:05-cv-01493—**Elaine E. Bucklo,** *Judge.*

---

ARGUED JANUARY 15, 2010—DECIDED APRIL 22, 2010

---

Before WOOD, EVANS, and SYKES, *Circuit Judges*.

EVANS, *Circuit Judge.*   Kenneth Swearnigen-El was charged with custodial sexual misconduct while employed as a correctional officer in the Cook County jail's women's division and subsequently resigned.[1] After

---

[1] Today, we also decide the case of *Egonmwan v. Cook County Sheriff's Department*, No. 09-2764, which arises from the same

(continued...)

being acquitted of the charge in state court, Swearnigen brought this lawsuit against the Cook County Sheriff's Department, which operates the Cook County Department of Corrections (CCDOC) and Sheriff's Police (CCSP); the County of Cook; the sheriff, Michael Sheahan; two CCDOC directors, Callie Baird and Scott Kurtovich; and the superintendent of the women's division, Katie Harrison. Swearnigen alleges that the defendants constructively discharged him because of his gender, race, and protected speech and initiated a malicious prosecution that caused him extreme emotional distress. The defendants, on the other hand, contend that they took no adverse action against Swearnigen, and even if they did, it was because of his sexual misconduct. The district judge sided with the defendants, dismissing one claim, *see Swearingen-El v. Cook County Sheriff's Dep't*, 416 F. Supp. 2d 612, 616-17 (N.D. Ill. 2006), and granting summary judgment on the rest. *See Swearnigen-El v. Cook County Sheriff's Dep't*, No. 05 C 1493, 2009 WL 1849809 (N.D. Ill. June 26, 2009). Swearnigen now appeals.

---

[1] (...continued)
investigation of custodial sexual misconduct in the women's division. Like Swearnigen, Egonmwan was charged but acquitted after a bench trial, by the same state court judge. He then brought a lawsuit, by the same counsel, against the defendants, alleging gender and race discrimination (among other things), which was dismissed on summary judgment. *See Egonmwan v. Cook County Sheriff's Dep't*, No. 06 C 4764, 2009 WL 1139150 (N.D. Ill. Apr. 27, 2009).

At this stage in the proceedings we must construe all facts and reasonable inferences in favor of Swearnigen.[2] As so viewed, the facts are that CCDOC General Order 3.8 forbids employees from engaging in (1) "activities unbecoming of county employees, or conduct that reflects unfavorably to the Office of the Sheriff of Cook County" and (2) "sexual conduct or sexual relationships, physical in nature, with a person in the custody and care of the CCDOC." It also directs employees to report code violations as follows:

> It shall be the responsibility of every employee to immediately report to their divisional Superintendent/Unit Head and the department Internal Investigations Unit verbally and in writing, any fact or situation which may give rise to or be construed as corrupt, illegal or unethical behavior and/or a possible conflict of interest. This shall include, but not be limited to, reporting anything which could impair the employee's performance of their duties in a fair and impartial manner.

Swearnigen, a black[3] male, began working as a correctional officer at the jail in 1986. He held various positions

---

[2] The defendants criticize the statement of facts section of Swearnigen's appellate brief as argumentative. As Swearnigen concedes, his statement may not have been "the most artfully stated," but we decline the defendants' request to impose sanctions.

[3] Swearnigen refers to his race as "Black" so we will do the same. Egonmwan, in the companion case, refers to himself as "African-American" so in his case we will do the same.

with the labor union that represented correctional officers from 1990 to 2001. Swearnigen also attempted to bring a new union into the CCDOC in February 2002. During his time in the women's division, Swearnigen voiced concerns about jail policies and helped other officers with their complaints against management—activities of which Harrison was aware.

According to Swearnigen, Harrison and he bumped heads in January 2003,[4] when Harrison told him that her "first goal as Superintendent was to remove all the men out of the [women's] division" and therefore Swearnigen "must go." During this same conversation, Harrison also criticized Swearnigen's efforts to help another officer file a harassment complaint against her. Swearnigen responded that he would "fight" Harrison on her attempt to remove men from the division because it "was discriminatory and retaliatory." He also reported his concerns to other supervisors.

In March or April 2003, Nicole Burns, a female detainee, gave Harrison a letter alleging that male correctional officers were engaging in sexual intercourse with her and other detainees in the women's division. The letter

---

[4] Swearnigen now argues, without citing to the record, that this conversation took place "[s]ometime after May 2003 but before July 3, 2003." The defendants, on the other hand, point to three places in the record where Swearnigen admitted that the conversation took place in January 2003. It therefore would be unreasonable to accept Swearnigen's contention as to when the conversation occurred.

did not specifically name Swearnigen. Harrison sent the letter to Kurtovich and the CCDOC's Internal Affairs Department (IAD), which then forwarded the allegations to the CCSP. There is some evidence that Harrison made a phone call to the IAD that brought Swearnigen's name into the investigation, although Harrison disputes this contention. Detectives from the CCSP conducted interviews of female detainees, including Latoya Williams, who later claimed that detectives threatened her and offered her bribes to implicate Swearnigen. Approximately 20 male officers, about half of them black, were "suspects of interest" in the sweeping investigation. The detectives reported their findings to the Cook County State's Attorney.

In June 2003, two assistant state's attorneys (ASAs) began interviewing detainees. They did not interview Williams or the defendants. Harrison attended some of the detainees' interviews and purportedly questioned them, but the defendants otherwise were not involved. During the investigation, detainees said that Swearnigen was having inappropriate relations with detainee Portia Warrington. Warrington was interviewed by the ASAs and admitted that she had sex with Swearnigen. Telephone records also showed that between March 1 and May 31, 2003, Warrington made about 100 collect calls from the jail to Swearnigen's personal cell phone and that he accepted about 25 of those calls. Swearnigen now contends that he gave Warrington his phone number because she said that supervisors were threatening her and "messing with [her] case."

On July 3, 2003, the IAD de-deputized Swearnigen for "conduct unbecoming" and transferred him to an external operations post. A month later, Swearnigen began a scheduled vacation outside the country. While he was away, on August 13, 2003, a warrant for his arrest was issued and he was charged with custodial sexual misconduct. Two of the other 20 or so officers who were the subjects of the investigation, James Anthony and Iyare Egonmwan, were also charged. Like Swearnigen, Anthony and Egonmwan are black.

The ASAs testified that they did not consult with the defendants on their charging decisions and that the three officers were tagged due to consistent witnesses' statements and corroborative evidence. Sheahan held a press conference after the charges were issued, stating, "This is something where individuals made bad choices and put themselves in a position where they abused their power and they'll pay the consequences." Swearnigen also claims that another person heard Sheahan call him a "fugitive."

On August 26, 2003, Swearnigen was suspended with pay pending a hearing pursuant to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), as only the merit board could terminate his employment. *See* 55 ILCS 5/3-7012. One white officer, Paul Usyak, was also de-deputized and suspended with pay pending a *Loudermill* hearing for living with a former inmate. (Usyak was not, however, criminally charged.) Upon returning from vacation, Swearnigen surrendered to the CCSP. He later testified that someone told him that Kurtovich

wanted him to be placed in a maximum security area, which caused him great distress. Swearnigen actually was placed in a one-person, unlocked cell in a psychological evaluation area. He bonded out a few hours later. As a result of these incidents, he now suffers from posttraumatic stress disorder.

On August 28, 2003, Swearnigen resigned, noting in his paperwork that he was leaving to attend school. He later testified that he really resigned because of the administrative proceedings but did not want to explain that to a future employer. The women's division was subsequently converted into a unit monitored almost exclusively by female officers. The female-only policy was deemed a bona fide occupational qualification. Male officers in that division were transferred, not terminated.

At Swearnigen's state court bench trial, in June 2004, neither the defendants nor Swearnigen testified. Warrington, however, did testify and repeated her earlier statements that, while she was a detainee, she had sex with Swearnigen. The ASAs agreed to recommend a reduction in Warrington's sentence in exchange for her testimony. The parties stipulated that Warrington made 100 calls from the jail to Swearnigen's phone and that he accepted 25 of them. Despite this evidence, Swearnigen was acquitted.[5]

_____

[5] The trial judge found no corroboration for Warrington's testimony, which he discounted because, while on the stand, Warrington told the prosecutor that she did not like her,

(continued...)

After the trial, Swearnigen filed an EEOC charge, alleging that he had been "discriminated against on the basis of my race, Black, and sex, male, in violation of Title VII of the Civil Rights Act of 1964, as amended." The charge did not mention retaliation. According to Swearnigen, however, the EEOC investigator refused to allow him to add this claim. Swearnigen received a "right to sue" letter and thereafter filed a six-count complaint alleging (1) gender and race discrimination and retaliation under Title VII of the Civil Rights Act of 1964; (2) gender and race discrimination under 42 U.S.C. § 1983; (3) race discrimination under 42 U.S.C. § 1981; (4) First Amendment retaliation under 42 U.S.C. § 1983; (5) malicious prosecution under Illinois law; and (6) intentional infliction of emotional distress under Illinois law. The district court dismissed Swearnigen's Title VII retaliation claim and later granted the defendants' motion for summary judgment on the remaining claims.

We review the grant of summary judgment *de novo. Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009). Summary judgment is appropriate where the admissible evidence shows that "there is no genuine issue as to

---

[5] (...continued)
which, according to the judge, "show[ed] utter contempt and disrespect for members of law enforcement." The judge also suggested that, by "willingly" having sex with Swearnigen, Warrington was "aiding and abetting in the commission of a felony." That remark is rather curious when one considers that the custodial sexual misconduct statute clearly states that an inmate is incapable of consent. *See* 720 ILCS 5/11-9.2(e).

any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008) (internal quotation marks omitted).

The first issue is whether summary judgment was appropriate on Swearnigen's gender and race discrimination claims. The district judge found that Swearnigen had not shown an adverse employment action (he argued only constructive discharge), a required element of those claims. *See Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 730 (7th Cir. 2009); *Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006); *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004); *see also Fischer v. Avanade, Inc.*, 519 F.3d 393, 408-09 (7th Cir. 2008) ("Constructive discharge does constitute an adverse employment action . . . ."). We agree.

The Supreme Court has held that, to establish constructive discharge, a plaintiff must show that her working conditions, from an objective standpoint, "became so intolerable that her resignation qualified as a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 133-34, 141 (2004). We have found constructive discharge where "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns . . . ." *E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002). But we have subsequently clarified that "the pros-

pect of being fired at the conclusion of an extended process," without more, does not meet this standard. *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333-34 (7th Cir. 2004).

In addition to *Cigan*, the defendants rely on *Levenstein v. Salafsky*, 414 F.3d 767 (7th Cir. 2005), in arguing that Swearnigen was not constructively discharged. There, the plaintiff, a professor on the faculty of the medical school at the University of Illinois in Rockford, was suspended with pay pending a sexual harassment investigation, temporarily assigned off campus for almost a year, removed as department head, and given "demeaning" tasks before finally resigning. We distinguished *Parrett v. City of Connersville, Indiana*, 737 F.2d 690 (7th Cir. 1984), because there the plaintiff was forced to sit in a windowless broom closet and spend his entire shift with nothing to do, and the reassignment was not explicitly temporary. *Levenstein*, 414 F.3d at 774-75. Ultimately, we held that "a person who is on leave with pay, with a temporary (though unsatisfying) reassignment pending an investigation of serious job misconduct, who resigns rather than waits for the conclusion of reasonable prescribed due process procedures of the institution, has not from an objective standpoint been constructively discharged." *Id.* at 775.

In response, Swearnigen primarily points to the consequences of his criminal proceedings—being charged, arrested, and (briefly) jailed—as evidence that he endured "much more" than the plaintiff in *Levenstein*. But none of these actions involved Swearnigen's working

conditions or the defendants. Swearnigen was de-deputized and transferred to an external operations post by the defendants. But this came after a comprehensive investigation revealed evidence of misconduct and did not impact his pay. Moreover, there is no evidence that conditions at the operations post came close to those in *Parrett*. This leaves Swearnigen with the argument that his suspension, with pay and pending his *Loudermill* hearing, constituted constructive discharge. As Swearnigen lasted only two days on paid leave before resigning and never participated in administrative proceedings, he has an even weaker argument than the plaintiff in *Levenstein*. Because no reasonable jury could find that Swearnigen was constructively discharged, summary judgment was proper on his discrimination claims.

Even assuming that Swearnigen could prove an adverse employment action, to avoid summary judgment he would still have to either point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue (the "direct" method), or establish a prima facie case under the *McDonnell Douglas* formula (the "indirect" method).[6] *Paz v. Wauconda Healthcare & Rehab. Ctr.*, 464 F.3d 659, 665 (7th Cir. 2006). A prima facie case under the indirect method requires

---

[6] The same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007); *Davis v. Wis. Dep't of Corrections*, 445 F.3d 971, 976 (7th Cir. 2006).

Swearnigen to prove that (1) he is a member of a pro-
tected class; (2) his job performance met the CCDOC's
legitimate expectations; (3) he suffered an adverse em-
ployment action; and (4) another similarly situated indi-
vidual outside his protected class was treated more
favorably. *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750-
51 (7th Cir. 2006). After making this showing, if the defen-
dants counter with legitimate, nondiscriminatory rea-
sons for their actions, Swearnigen would also have to
show that those reasons were pretextual. *Id.* at 751.

Swearnigen purports to establish gender discrimina-
tion via the direct method, pointing to Harrison's
January 2003 statement as evidence of discriminatory
motivation and analogizing to *Lewis v. City of Chicago*,
496 F.3d 645 (7th Cir. 2007).[7] In *Lewis*, we found that a
supervisor's remark "that he prevented [the plaintiff]
from participating on [a job] because she was a female
and that 'it was going to be a working trip, and he
thought it would be dangerous and that [she] would
thank him for it later'" presented an issue of fact for trial.
*Id.* at 651. Here, however, Harrison's January 2003 state-
ment that she wanted to remove men from the women's
division did not concern the employment action in ques-
tion, as the female-only policy was not implemented
until after Swearnigen resigned. Moreover, the time
lapse between this statement and the July and August
actions against Swearnigen is too long to support an

---

[7] It is understandable that Swearnigen would rely on *Lewis*,
as his counsel also represented the plaintiff in that case.

inference of discrimination. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781-82 (7th Cir. 2007) ("[S]tray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment."). Swearnigen cannot avoid summary judgment on his gender discrimination claim.

Swearnigen attempts to show race discrimination via both methods of proof. Under the direct method, he points to circumstantial evidence, arguing that similarly situated nonblack officers were treated more favorably and that the defendants' proffered reasons for taking action against him were pretextual. Because these are also required elements of his case under the indirect method, our analyses overlap. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490-91 (7th Cir. 2007) (explaining that the indirect method "involves a subset of circumstantial evidence (including the disparate treatment of similarly situated employees) that conforms to the prescription of [*McDonnell Douglas*]"); *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003) (explaining that the "pretext" category of circumstantial evidence under the direct method is substantially the same as the evidence required under the indirect method).

The evidence shows that around 20 officers of various races were "suspects of interest" during the investigation, including many black officers who were *not* ultimately disciplined by the defendants. If the defendants had racial animus, we would have expected them to take action against more than three of the black suspects. Swearnigen contends, however, that one similarly situated

white officer, Usyak, was treated more favorably. But the defendants took action against Usyak: like Swearnigen, he was de-deputized and suspended with pay pending a *Loudermill* hearing before he resigned. The fact that Usyak was not criminally charged is irrelevant because that decision was made by the ASAs. Furthermore, Usyak is not similarly situated because he was suspended for living with a *former* detainee, while Swearnigen was suspended for having sex with a *current* detainee.

Meanwhile, the defendants offer legitimate, nondiscriminatory reasons for their actions: (1) Burns's letter stated that officers in Swearnigen's division were having sex with detainees; (2) detainees told investigators and the ASAs that Swearnigen was having sex with Warrington; (3) Warrington admitted having sexual contact with Swearnigen in the jail; and (4) phone records indicated that Swearnigen accepted collect calls from Warrington to his personal cell phone. General Order 3.8 prohibits these acts; thus, Swearnigen was not meeting his legitimate job expectations. And the fact that Swearnigen was subsequently acquitted does not demonstrate pretext because the government bore a high burden of proof at trial. *See Faas*, 532 F.3d at 642 ("Pretext means a dishonest explanation, a lie rather than an oddity or an error.") (internal quotation marks omitted). Because Swearnigen has not shown discriminatory motivation under the direct method or carried his burden under the indirect method, he cannot avoid summary judgment on his race discrimination claim.

   The second issue is whether summary judgment was appropriate on Swearnigen's First Amendment retaliation claim. To establish a prima facie case, Swearnigen had to present evidence that (1) his speech was constitutionally protected; (2) he suffered a deprivation that would likely deter protected speech; and (3) the protected speech was at least a motivating factor in the defendants' actions. *Nagle*, 554 F.3d at 1123. After making this threshold showing, if the defendants produce evidence that they would have taken action against Swearnigen even in the absence of his speech, Swearnigen would also have to show that those reasons were pretextual. *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006). The district judge found that Swearnigen had not established a prima facie case. We agree.

   Speech is constitutionally protected if (1) the employee spoke "as a citizen on matters of public concern" and (2) his interest in commenting upon those matters outweighs the employer's interest in promoting the efficiency of its services. *Nagle*, 554 F.3d at 1123. When employees make statements "pursuant to their official duties," they are not speaking "as citizens" for First Amendment purposes. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).[8] Whether speech addresses a matter of public

---

[8] Swearnigen criticizes the district judge's invocation of *Garcetti*, which was not cited by the defendants until their reply brief on summary judgment. We find the issue sufficiently raised to be preserved on appeal. *See Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008).

concern must be determined by its "content, form, and context," *Connick v. Myers*, 461 U.S. 138, 147-48 (1983), with content being the most important. *Nagle*, 554 F.3d at 1123.

The most content-rich speech Swearnigen offers is his January 2003 statement to Harrison, while on duty, that he would "fight" her efforts to remove all male officers from the women's division because it "was discriminatory and retaliatory." In *Mills v. City of Evansville, Indiana*, 452 F.3d 646, 647-48 (7th Cir. 2006), however, we held that the plaintiff spoke as a public employee when, while on duty and in uniform, she objected to a proposed policy change, leaving the impression that she would enlist community organizations against it. Swearnigen likewise was speaking in his capacity as a public employee "contributing to the formation and execution of official policy" when he disagreed with Harrison's plan. *Id.* at 648.

Also working against Swearnigen is General Order 3.8, which created a duty to report "any fact or situation which may give rise to or be construed as corrupt, illegal or unethical behavior and/or a possible conflict of interest." Swearnigen criticizes this order as an effort to foil First Amendment attacks but fails to acknowledge that we have already considered it. In *Houskins*, 549 F.3d at 491, we held that, when the plaintiff officer in the case filed a complaint with the IAD, she was "fulfilling her responsibility as a CCDOC employee to report incidents of misconduct . . . pursuant to the General Orders" and therefore not speaking as a citizen. *See also Spiegla v. Hull*,

481 F.3d 961, 967 (7th Cir. 2007) (finding that the plaintiff "'acted as a government employee' when she reported the possible misconduct to her superior and sought clarification of a security policy she felt may have been breached"). Similarly, Swearnigen's complaints to his superiors about Harrison's proposed policy were made pursuant to his duties.

Swearnigen also fails to show that his other speech was constitutionally protected. As the district judge pointed out, at this stage Swearnigen must do more than generally aver that he "spoke out" on various issues without providing evidence that the content, form, and context of those disputes relate to public concerns rather than personal grievances. *See, e.g., Nagle*, 554 F.3d at 1124 (affirming summary judgment where "the content or form of the statement . . . is unclear from the record, nor is it apparent how these statements, whatever they may be, relate either to [the plaintiff's] job as a police officer, his status as a citizen, or his capacity as a union representative"). And, as for his speech as a union steward from 1990-2001 and efforts to bring in a new union in February 2002, they are too far removed to support an inference of retaliatory motive. *See, e.g., Wallscetti v. Fox*, 258 F.3d 662, 669 (7th Cir. 2001) (finding that a lag time of four months, without more, is too long to support a reasonable inference of causation).

Finally, even if Swearnigen could establish a prima facie case of retaliation, no rational juror could find that the defendants' reasons for taking action against him were pretextual. As we discussed in conjunction with

Swearnigen's discrimination claims, the defendants had substantial evidence that Swearnigen violated general orders, and even a criminal law, by engaging in sexual relations with a female detainee. Moreover, the defendants proceeded against other officers—who are not alleged to have engaged in protected speech—for similar alleged wrongdoing. Summary judgment was proper on Swearnigen's First Amendment retaliation claim.

The next issue is whether summary judgment was appropriate on Swearnigen's malicious prosecution claim. To establish this claim under Illinois law, Swearnigen must show (1) the commencement or continuation of an original criminal or civil proceeding by the defendants; (2) termination of the proceeding in his favor; (3) the absence of probable cause; (4) the presence of malice on the defendants' part; and (5) damages. *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 319 (Ill. App. Ct. 2006). The district judge found that Swearnigen could not satisfy the third element. Again, we agree.

Probable cause is "a state of facts that would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested committed the offense charged." *Id.* "[I]t requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (internal quotation marks omitted). Under Illinois law, a grand jury indictment is prima facie evidence of probable cause. *Bontkowski v. United States*, 28 F.3d 36, 37 (7th Cir. 1994).

As we previously discussed, the proceedings against Swearnigen were initiated because (1) a detainee's letter stated that officers in Swearnigen's division were having sex with detainees; (2) detainees, including Warrington herself, said that Swearnigen was having sex with Warrington; and (3) phone records indicated that Swearnigen accepted collect calls from Warrington to his personal cell phone. Swearnigen attempts to negate this showing by accusing the defendants (Harrison, primarily) of misconduct during the investigation. In particular, Swearnigen focuses on evidence that Harrison "triggered" the investigation against him. But, as we pointed out at oral argument, how the investigation was triggered is not the point. Rather, the point is that, *after* the investigation was triggered, evidence of misconduct was uncovered, the ASAs independently decided to bring charges, and a grand jury issued an indictment—all without any input from Harrison or the other defendants. The fact that Swearnigen was eventually acquitted and now offers an innocuous explanation for the phone calls does not negate the existence of probable cause at the relevant time. *See Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998) ("[P]robable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth, that matters."); *see also Mustafa v. City of Chi.*, 442 F.3d 544, 548 (7th Cir. 2006) (finding that there is "no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established . . .". Summary judgment was proper on Swearnigen's malicious prosecution claim.

Moving on, we next consider whether summary judgment was appropriate on Swearnigen's intentional infliction of emotional distress claim. To prove this claim under Illinois law, Swearnigen must show that (1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress. *Kolegas v. Heftel Broad. Corp.*, 607 N.E. 2d 201, 211 (Ill. 1992). The district judge found that Swearnigen failed to satisfy the first element. Once again, we agree with the district judge.

To meet the "extreme and outrageous" standard, the defendants' conduct "must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Id.* The evidence shows that the defendants' only actions were de-deputizing Swearnigen, transferring him to another post, and suspending him with pay pending a *Loudermill* hearing. Even when we add Harrison's alleged "triggering" of the investigation against Swearnigen, the conduct does not rise to "extreme" levels because, after the investigation was triggered, the CCSP and ASAs uncovered evidence that supported the actions taken against him.

Swearnigen also claims that other people heard Sheahan call him a "fugitive" and heard Kurtovich order him placed in a maximum security area. But, when offered to prove their truth, Swearnigen's statements are double hearsay, and no exception is offered for the "outer layer" of the hearsay. *See, e.g., Halloway v. Milwaukee*

*County*, 180 F.3d 820, 824-25 (7th Cir. 1999) (holding that the plaintiff's testimony that other people told him that they had heard the defendants discussing how they could "get rid of" him and force him to retire was inadmissible double hearsay). Moreover, Swearnigen was never placed in a maximum security area but rather in a one-person, unlocked cell for a few hours before bonding out. Summary judgment was proper on Swearnigen's intentional infliction of emotional distress claim.

The final issue is whether the district court properly dismissed Swearnigen's Title VII retaliation claim because he failed to bring it in his earlier EEOC proceeding.[9] We review the decision *de novo*, accepting all well-pled allegations as true and drawing all favorable inferences in Swearnigen's favor. *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 434 (7th Cir. 2009). A Title VII plaintiff may bring only those claims that were included in his EEOC charge or that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 481 (7th Cir. 1996); *see also Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000) (finding that failure to exhaust is not a jurisdictional requirement, albeit a reason for dismissal). To be "like or reasonably related," the claims must, at

---

[9] Swearnigen does not contend that the alleged retaliation arose after his EEOC charge had been filed, which would not require exhaustion. *See Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 545 n.2 (7th Cir. 1988).

No. 09-2709

minimum, describe the same conduct and implicate the same individuals. *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994).

   Swearnigen's charge only alleges that he had been "discriminated against on the basis of my race, Black, and sex, male, in violation of Title VII of the Civil Rights Action of 1964, as amended." As the district judge pointed out, Swearnigen did not check the box for re-taliation or otherwise indicate that action had been taken against him for reasons other than his race and gender. Normally, retaliation and discrimination charges are not considered "like or reasonably related" to one another. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003); *Steffen*, 859 F.2d at 545. Instead of distinguishing this case law, Swearnigen now blames the EEOC, arguing that the investigator refused to let him add a retaliation claim and citing *Federal Express Corp. v. Holowecki*, 552 U.S. 389 (2008), in support of his argument that the district judge should have looked beyond the formal charge.

   *Holowecki* is inapposite. The issue there was whether an intake questionnaire supplemented by a six-page affidavit constitutes a "charge" for purposes of timeliness of an ADEA lawsuit. The Court held that "[i]n addition to the information required by the regulations, . . . if a filing is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Id.* at 402. Here, the issue is not whether a charge was timely

filed (it was) but rather whether it included an allegation of retaliation. *See Morrow v. Metro. Transit Auth.*, No. 08 CIV.6123 (DLC), 2009 WL 1286208, at *6 (S.D.N.Y. May 8, 2009) (discussing reasons to restrict *Holowecki* to timeliness issues).

We have suggested that written "[a]llegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations." *Vela v. Vill. of Sauk Vill.*, 218 F.3d 661, 664 (7th Cir. 2000); *cf. Novitsky v. Am. Consulting Eng'rs, L.L.C.*, 196 F.3d 699, 702 (7th Cir. 1999) (rejecting reliance on questionnaire where the plaintiff read the formal charge and obtained legal advice before signing it). But here, even if we examine Swearnigen's intake questionnaire, we find that it does not state a charge of retaliation. Dismissal of Swearnigen's Title VII retaliation claim was proper.

In sum, Swearnigen was one of many suspects in a wide-ranging investigation of custodial sexual misconduct. He has not shown that improper motivations—as opposed to corroborated evidence of wrongdoing—caused the defendants to take action against him. This ultimately dooms his claims. The judgments of the district court are AFFIRMED.